## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BRENT WESTBROOK,**

     **Plaintiff,**

**v.**                                                    **Case No: 8:23-cv-477-MSS-LSG**

**EQUIFAX INFORMATION
SERVICES, LLC,**

     **Defendant.**

_____

## <u>ORDER</u>

**THIS CAUSE** comes before this Court for consideration of Defendant Equifax Information Services, LLC's Motion for Summary Judgment, (Dkt. 58), Plaintiff's response in opposition, (Dkt. 69), and Defendant's reply. (Dkt. 70) Upon consideration of all relevant filings, case law, and being otherwise fully advised, Defendant's Motion is **GRANTED IN PART and DENIED IN PART**.

### I.    BACKGROUND

This case concerns Defendant Equifax's alleged violation of the Fair Credit Reporting Act (the "FCRA"). The following undisputed facts arise from the Complaint, Equifax's Motion for Summary Judgment, and Plaintiff's filings in support of his response to the Motion. (Dkts. 1, 58, 67, 68)

#### a.  Factual Background

Plaintiff is a "consumer" or "debtor" as defined by the FCRA. (Dkt. 68-2 at ¶ 5) Equifax is a consumer reporting agency ("CRA") as defined by the FCRA. (<u>Id.</u> at ¶

6) Equifax gathers information about consumers from various sources, including banks, collection agencies, and court records, and uses that information to create credit files on consumers. (Id.) Equifax's credit files are used to prepare consumer reports that are requested by subscribers who wish to evaluate whether to extend credit to a consumer. (Id. at ¶ 7)

Equifax accepts credit information from data furnishers, like Capital One. (Id. at ¶ 8) Equifax requires that its data furnishers sign an agreement that requires compliance with all applicable federal, state, and local laws, including the FCRA. (Id.) The agreement also requires furnishers to notify Equifax promptly upon learning that information furnished is inaccurate or incomplete. (Id.)

### i. Equifax's Procedure for Investigating Disputes.

A consumer may contact Equifax to dispute information in his or her credit file by telephone, mail, or through an Internet portal on Equifax's website. (Id. at ¶ 10) Upon receipt of a dispute, Equifax locates the consumer's credit file and opens a dispute case (a "CCMS case") that tracks the process of a "reinvestigation." (Id.) Equifax's policy is then to review all relevant information, including the contents of the consumer's credit file and any supporting documentation provided by the consumer. (Id.) According to Equifax's policies and procedures, if Equifax can determine that disputed information should be removed from a file based on its own reinvestigation, Equifax will update a consumer's file. (Id.) If more information is required—such as information known only to the data furnisher—Equifax's procedure is to notify the data furnisher of the consumer's dispute, identify the nature of the

consumer's dispute, share the consumer's dispute letter and any supporting documents provided by the consumer, and include the consumer's information as it then appears in Equifax's credit file. (Id.)

Equifax communicates consumers' disputes to data furnishers with an Automated Consumer Dispute Verification ("ACDV") form in a system called e-OSCAR. (Id. at ¶ 11) The ACDV process permits Equifax to communicate with data furnishers by using pre-defined codes and narrative phrases. (Id.) Through the ACDV, Equifax transmits to the data furnishers all documents received by the consumer. (Id.) E-OSCAR requires data furnishers to review the images attached to the ACDV before returning a response to the consumer reporting agency. (Id.)

When a data furnisher receives a dispute from Equifax, the data furnisher is generally required, both by its contract with Equifax and the FCRA, to conduct its own investigation and report the results back to Equifax. (Id. at ¶ 12) If the data furnisher advises Equifax to delete, update, or modify the consumer's file information, then Equifax updates the file, if doing so is appropriate under Equifax's policies and procedures. (Id.) Upon completion of its reinvestigation, Equifax's policy is to send the consumer its reinvestigation results along with a summary of the consumer's rights under the FCRA. (Id.) Equifax also advises the consumer of additional steps the consumer may take if they believe their dispute has not been resolved. (Id.)

**ii. Plaintiff's Disputes with Equifax and Equifax's Investigations.**

On or about February 7, 2019, a Capital One Account (Account Number XXXXXXXX7495-) (the "Account") was fraudulently opened in Plaintiff's name. (Dkt. 68-2 at ¶ 1) Plaintiff first learned that the Account existed and appeared on his credit reports in January 2022, when he was served with a collections lawsuit filed by Capital One in a county court in Florida (the "Collections Suit"). (Dkt. 67-2 at 27:4-12, 32:22–33:1; Dkt. 68-2 at ¶ 2) In the Collections Suit, Capital One sought payment on a debt of more than $16,000.00 owed on the Account (the "Debt"). (Id.)

Ultimately, the state court dismissed the Collections Suit with prejudice on July 20, 2023. (Id. at ¶ 3) Plaintiff did not owe the Debt to the Capital One because Plaintiff did not open the Account. (Id. at ¶ 4)

About one year prior to the Collection Suit's dismissal, after having received notice of Capital One's lawsuit against him, Plaintiff obtained copies of his consumer report from Equifax. (Id. at ¶ 13) Equifax reported the Account as owed by Plaintiff personally with a past-due balance of $16,780.00 as of July 2022. (Id. at ¶ 14)

From July 2022 to February 2023, Plaintiff disputed the Account with Equifax four times. In connection with these disputes, Plaintiff never provided Equifax with any copies of Plaintiff's identification. (Id. at ¶ 17) Each written dispute, however, provided his full first and last name, his middle initial and/or middle name, the last four digits of his Social Security Number, his full date of birth, his full current address,

and the first twelve digits of the Capital One Account Number at issue. (<u>Id.</u> at ¶¶ 18, 32–33)

First, Plaintiff sent a letter dated July 25, 2022 to Equifax to dispute the Account as belonging to Plaintiff (the "First Dispute"). (<u>Id.</u> at ¶ 15) In the First Dispute, Plaintiff advised Equifax that the Account did not belong to him and requested that Equifax delete the Account from his credit report and credit file. (<u>Id.</u> at ¶ 16) The First Dispute did not enclose any supporting documents. (<u>Id.</u> at ¶ 17)

Equifax received Plaintiff's First Dispute on July 31, 2022, and opened a CCMS case to track the process of the investigation. (<u>Id.</u> at ¶¶ 19, 20) Equifax characterized the First Dispute with the Dispute Code [001] "NOT HIS/HERS." (<u>Id.</u> at ¶ 22) Latonya Munson, Equifax's corporate representative, testified that the dispute agent would not have characterized Plaintiff's First Dispute as a fraud dispute because an assertion that an account does not belong to the consumer is characterized as "an ownership dispute." [1] (Dkt. 67-3 at 19:19–20:2, 23:19-25)

Equifax communicated Plaintiff's First Dispute to Capital One on August 2, 2022. (Dkt. 68-2 at ¶ 21) Equifax provided Capital One the Dispute Code [001] "NOT HIS/HERS," and requested that Capital One "PROVIDE COMPLETE ID." (<u>Id.</u> at ¶ 22) Capital One apparently conducted its own investigation and advised Equifax that

---

[1] Ms. Munson testified that she did not know the identity of the dispute agent who reviewed Plaintiff's First Dispute. (Dkt. 67-3 at 24:1–26:16) Thus, presumably, Ms. Munson never spoke with the dispute agent concerning the agent's handling of Plaintiff's dispute. Other than actions of the dispute agent that were recorded (such as the initiation of a CCMS case), Ms. Munson could only testify as to what an agent would have done or should have done if the agent acted according to Equifax's policies and procedures.

the Account belonged to Plaintiff and was reporting accurately. (Id. at ¶ 23) Thus, Equifax continued to report the Account on Plaintiff's credit report and credit file. (Id. at ¶¶ 24–25) In an August 8, 2022 response to the First Dispute, Equifax advised Plaintiff that he "may provide [Equifax] additional information or documents (such as an identity theft report . . . )." (Id. at ¶ 28)

Plaintiff sent a second letter dated September 22, 2022 to Equifax to dispute the Account (the "Second Dispute"). (Id. at ¶ 29) In the Second Dispute, Plaintiff enclosed a copy of Plaintiff's Federal Trade Commission ("FTC") Identity Theft Report, which identified the fraudulent account as "Capital One" but did not include the Account number. (Id. at ¶ 30) Plaintiff signed the FTC Identity Theft Report under the penalty of perjury. (Id. at ¶ 31) In the Second Dispute, Plaintiff advised Equifax, "Again- this is not my Capital One account." (Id. at ¶ 34) Plaintiff directed Equifax to the identity theft report and requested that Equifax remove the Account from his credit report and credit file. (Id.)

Equifax received Plaintiff's Second Dispute on September 29, 2022 and opened a CCMS case. (Dkt. 68-2 at ¶¶ 35, 36) Ms. Munson testified that the dispute agent's notes "indicate the FTC invalid, invalid due to the account name missing . . . ." (Dkt. 67-3 at 36:18–37:1) Ms. Munson explained that this comment "means that . . . the FTC Identity Theft Report was insufficient or invalid for Equifax to block information on the credit file because the account name was not provided." (Id. at 37:2-8) Ms. Munson testified, "I think that note was placed in error" because Plaintiff's FTC affidavit did include the Account name, i.e., Capital One. (Id. at 37:21-24) However,

Ms. Munson also testified that under Equifax's policies and procedures, an FTC Identity Theft Report is valid if it includes the account name and a full or partial account number. (Id. at 37:25–38:8) She reasoned that the dispute agent properly found Plaintiff's FTC affidavit to be invalid because it contained only the Account name and not the full or partial Account number. (Id.)

However, Ms. Munson also testified that Equifax "agents are trained to review the information that's provided within the contents of the dispute letter and any supporting documentation." (Id. at 46:6-10) It is undisputed that Plaintiff's Second Dispute contained the name of the Account (Capital One) and the partial account number, and that Plaintiff's FTC affidavit contained the name of the Account. (Id. at 44:1–46:10) It also appears to be undisputed that Plaintiff's credit file at the time of the Second Dispute contained only one Capital One account, the disputed Account. (Id. at 42:11–43:2) Nonetheless, Ms. Munson testified that a dispute agent must refer to a supporting document to block information on the credit file, and the document "should include the account specifically by name and a full or partial account number." (Id. at 42:15-18) Thus, in this case, Ms. Munson testified that even though "the agent may have been able to determine that . . . there was only one Capital One account reporting on the credit file at that time[,] that agent could not use the FTC Identity Theft Report . . . to block information on the credit file" because the FTC affidavit did not contain a full or partial account number.[2] (Id. at 42:21–43:2) Ms.

---

[2] Again, Ms. Munson testified that she did not know the identity of the dispute agent who reviewed Plaintiff's First Dispute. (Dkt. 67-3 at 36:1-17) Other than actions taken by the dispute agent that were

Munson testified that she did not know whether the dispute agent who reviewed Plaintiff's Second Dispute had access to a phone or email such that the agent could contact Plaintiff about the dispute directly. (Id. at 50:5–51:24)

The Equifax agent who reviewed Plaintiff's Second Dispute contacted Capital One via ACDV. (Dkt. 68-2 at ¶ 37) The ACDV "advised [Capital] One that the account was being disputed as fraudulent . . . ." (Dkt. 67-3 at 57:6-9) Equifax also sent a letter to Plaintiff dated October 1, 2022 to update him on the status of the reinvestigation and advise him that before Equifax could unilaterally block the Account, Equifax needed "proof of [his] identity, the specific information that is the result of the identity theft, and a copy of [a] complete and submitted Identity Theft Report with the Federal Trade Commission . . . ." (Dkt. 68-2 at ¶ 38; Dkt. 58-7 at 3) Equifax's letter did not specify that Plaintiff's FTC Identity Theft Report was considered incomplete because it was missing the Account number. (Dkt. 68-2 at ¶ 39) Plaintiff never responded to Equifax's letter to provide identification or other information.

Capital One apparently conducted its own investigation, and then advised Equifax that the account belonged to Plaintiff and was "Verified as Reported." (Id. at ¶ 40) Equifax timely sent Plaintiff the results of its reinvestigation on October 16, 2022, which were that the reporting of the Account had been verified. (Id. at ¶¶ 41, 44)

---

recorded (such as the determination that the FTC affidavit was invalid), Ms. Munson could only testify as to what an agent would have done or should have done if the agent acted according to Equifax's policies and procedures.

Plaintiff sent a third letter dated January 20, 2023 to Equifax again disputing the Account (the "Third Dispute"). (Id. at ¶ 46) Plaintiff stated that the Account was not his and had inaccurately been verified as his despite the FTC Identity Theft Affidavit that was included with the Second Dispute. (Id. at ¶ 47) Plaintiff requested that Equifax delete the Account from his credit reports and credit file. (Id. at ¶ 50)

Plaintiff also attached to the Third Dispute documents he obtained during discovery in the Collections Suit. (Id. at ¶ 50) One document was a Capital One billing statement for the Account with charges occurring on May 11, 2019 in Miami, Florida. (Id.) The other document was a billing statement for Plaintiff's USAA credit card showing charges occurring on May 11, 2019 in Savannah, Georgia. (Id.) In the Third Dispute, Plaintiff explained he was in Savannah on that date. (Dkt. 58-9) Further, Plaintiff explained, "I have never had a Capital One Credit Card or account, and therefore, could not have authorized any one to use or borrow an alleged card on May 11, 2019 or any time." (Id.)

Equifax received the Third Dispute on January 29, 2023 and opened a CCMS case. (Dkt. 68-2 at ¶¶ 52, 53) The Equifax agent who reviewed Plaintiff's Third Dispute contacted Capital One via ACDV. (Id. at ¶ 54) The agent characterized Plaintiff's Third Dispute as an ownership dispute, rather than a dispute based on identity theft or fraud. (Dkt. 58-10) Thus, the ACDV asked Capital One to merely verify whether the Account belonged to Plaintiff. Capital One advised Equifax that the Account belonged to Plaintiff and was reporting accurately. (Dkt. 68-2 at ¶ 55)

Equifax sent Plaintiff a letter dated February 2, 2023 to Plaintiff in which Equifax requested a copy of two different items to verify his identity. (Id.) In this letter, Equifax indicated it had completed its reinvestigation in response to Plaintiff's Third Dispute but needed to verify his identity before sending him the results of its reinvestigation. (Id.) Plaintiff did not respond to this letter to provide identification.

On February 21, 2023, Plaintiff called Equifax and disputed the Account for the fourth time. (Id. at ¶ 56) Equifax's dispute agent summarized Plaintiff's telephone call dispute: "CONSUMER STATES THAT THIS ACCOUNT OPEN ON HIS NAME FRAUDULENTLY. ASKING REMOVING ON HIS FILE. CONSUMER SEND DOCUMENT ON EQUIFAX LAST OCTOBER 2022 WITH HIS FTC REPORT." (Id. at ¶ 57) Equifax opened a CCMS case and contacted Capital One via ACDV. (Id. at ¶¶ 58, 59) Capital One advised that the account belonged to Plaintiff and was reporting accurately. (Id. at ¶ 60) Equifax completed its reinvestigation on February 26, 2023 and informed Plaintiff that Equifax verified the Account was his. (Id. at ¶ 61)

In or around March 2023, Equifax suppressed the Account from Plaintiff's credit file and credit reports at Capital One's request. (Dkt. 67-3 at 34:17–35:5)

### iii. Plaintiff's Damages.

On or about November 5, 2021, Plaintiff and his then-girlfriend were in the process of buying a house.[3] (Dkt. 67-2 at 35:13-25–36:1-7) Plaintiff's application for a mortgage resulted in an inquiry of Plaintiff's credit by Credit Plus. (Id. at 37:1-15)

---

[3] Based on Plaintiff's deposition testimony, it appears Plaintiff and his wife married in or around July 2022. (See Dkt. 67-2 at 1; Id. at 11)

Plaintiff testified that "when they checked the credit, mine was too low and it would have increased our interest [rate] so we went with my wife's." (Id.) The mortgage and the deed for the home in which Plaintiff lives with his wife is only in his wife's name. (Id. at 37:16-20) During the mortgage application process, Plaintiff testified he did not recall receiving or seeing a copy of his credit report. (Id. at 37:21-25) ("Q. And to the best of your knowledge though, you don't recall seeing the specific details of your credit report, you just I guess focused on the credit score, the number? A. To the best of my knowledge, yes.")

In or around May or June 2022, Plaintiff sought to buy an engagement ring for his then-girlfriend. (Id. at 36:8-13, 50:2-4) Plaintiff applied for a loan through a jeweler. (Id. at 49:10-13) Plaintiff testified, "[T]hey brought me an option to start with and I got denied, and then they brought me another to try, and I got denied as well." (Id. at 49:6-24) When asked if the jeweler gave Plaintiff any written documentation of the reason for the loan denial, Plaintiff testified he did not "recall what the documentation was or what they gave to me." (Id. at 50:9-18) Plaintiff ultimately purchased an engagement ring for his wife with a loan he obtained from his mother. (Id. at 50:19-23)

Plaintiff testified he has chosen not to apply for any loans to finance the renovation of the home in which he lives with his wife because of his experience with credit denials. (Id. at 61:1-16)

In Plaintiff's responses to Equifax's interrogatories, Plaintiff stated,

> I have endured stress, anxiety, inconvenience, frustration, annoyance, confusion about how this could occur when I never opened the Capital One account and showed repetitive proof that I could not have opened the Capital One account. I was also embarrassed that I was hindered during my attempt to start my life, as the derogatory reporting was due to no fault of my own yet deprived me of being a signing party on my home mortgage because of the immediate impact this account had on my credit. Likewise, I could not obtain financing for my fiancé's engagement ring independently and had to ask for help from my family members in the form of their personal finances.
>
> I struggled with some pretty intense anxiety which at times leads to disruption of my daily routine and, more often than not, difficulty sleeping. I am decently private about all of this as it is embarrassing and have not sought medical attention. I have taken over the counter meds for headaches and difficulty sleeping.

(Dkt. 67-1 at 7) Plaintiff testified his emotional distress began when he was served with the lawsuit by Capital One in January 2022 and that it continues to the present. (Dkt. 67-2 at 56:7-18) Plaintiff testified he could not single out Equifax—vis-à-vis the other Defendants in this case—as having caused his emotional distress. (Id. at 53:4-10) Plaintiff testified he never visited a doctor or medical provider for any symptoms of his emotional distress. (Id. at 54:21-25)

### b. Procedural Background

Plaintiff initiated this action against Capital One and several consumer reporting agencies, including Equifax, on March 2, 2023. (Dkt. 1) In the Complaint, Plaintiff alleges Equifax violated the Fair Credit Reporting Act. Specifically, Plaintiff claims Equifax violated 15 U.S.C. §§ 1681e(b) and 1681i(a)(1), (4), and (5). Equifax moves for summary judgment on Plaintiff's claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356).  A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts

have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

The Court must determine whether Plaintiff's claims that Equifax violated the FCRA may be resolved as a matter of law. The FCRA imposes certain duties on consumer reporting agencies. See 15 U.S.C. §§ 1681e and 1681i. For example, under § 1681e(b), "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." And under § 1681i, if a consumer disputes the accuracy of information in the consumer's credit file or report, the agency must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . ." 15 U.S.C. § 1681i(a)(1)(A).

"The FCRA creates a private right of action against consumer reporting agencies for the negligent, see 15 U.S.C. § 1681o, or willful, see 15 U.S.C. § 1681n, violation of any duty imposed under the statute." Collins v. Experian Info. Sols., Inc., 775 F.3d 1330, 1333 (11th Cir. 2015) (citing Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007)). To succeed on a § 1681e(b) claim, a plaintiff must show that the CRA's report "contained factually inaccurate information, that the procedures it took in preparing and distributing the report weren't 'reasonable,' and that damages followed as a result." Losch v. Nationstar Mortg. LLC, 995 F.3d 937, 944 (11th Cir. 2021)

(citations omitted). "The elements of a claim under § 1681i—which focuses on the consumer's credit 'file' rather than his credit 'report'—are the same, except that the plaintiff needn't show that the agency prepared and distributed a report." Id.

In its Motion, Equifax first argues that Plaintiff has put forth no evidence that any of the alleged FCRA violations were so intentional or reckless that they may be considered willful. (Dkt. 58 at 11–13) Next, Equifax asserts that Plaintiff has provided no evidence that Equifax caused him any damages. (Id. at 13–18) Third, Equifax argues Plaintiff's § 1681e(b) claim fails because Plaintiff does not show that Equifax failed to follow reasonable procedures in preparing Plaintiff's credit report. (Id. at 18–20) Finally, Equifax contends Plaintiff's § 1681i claim fails as a matter of law because Plaintiff does not show that Equifax failed to reasonably reinvestigate his disputes. (Id. at 20–24)

In response, Plaintiff argues generally that whether a credit reporting agency acted reasonably under the FCRA is a question of fact that should be reserved for a jury. (Dkt. 69 at 14–17) Likewise, Plaintiff argues that a jury should decide whether Equifax's alleged FCRA violations were willful. (Id. at 18–20) Next, Plaintiff asserts he presents sufficient evidence of damages, and that he is not required to establish a causal relationship between Equifax's alleged violation and his alleged damages. (Id. at 12–13, 17)

The Court begins with Equifax's arguments that Plaintiff's claims fail because Plaintiff does not show that Equifax failed to follow reasonable procedures in

preparing Plaintiff's credit report or that Equifax failed to reasonably reinvestigate his disputes.

### a. Equifax is entitled to summary judgment on Plaintiff's § 1681e(b) claim.

Equifax is entitled to summary judgment on Plaintiff's § 1681e(b) claim because Plaintiff does not show that Equifax communicated Plaintiff's credit report to a third party after having notice that Plaintiff disputed the Account. Section 1681e(b) "requires a consumer reporting agency to follow reasonable procedures to assure maximum possible accuracy of a consumer report . . . ." Collins, 775 F.3d at 1335. To succeed on a § 1681e(b) claim, a plaintiff must show the consumer reporting agency published inaccurate information to a third party. Id. ("A 'consumer report' requires communication to a third party . . . ."). Importantly, "a reporting agency's procedures will not be deemed unreasonable unless the agency has a reason to believe that the information supplied to it by a data furnisher is unreliable." Losch, 995 F.3d at 945 (citations omitted).

Plaintiff provides no evidence that Equifax had any reason to believe the information Capital One supplied about Plaintiff was unreliable before Equifax received Plaintiff's First Dispute. Plaintiff also provides no evidence that Equifax prepared and distributed a consumer report after having received Plaintiff's First Dispute. As a matter of law, therefore, Plaintiff's claim that Equifax did not follow reasonable procedures to assure the accuracy of Plaintiff's consumer report fails. Equifax's Motion is **GRANTED** as to Count II of the Complaint.

**b. A genuine dispute of fact exists as to the reasonableness of Equifax's reinvestigations of Plaintiff's disputes.**

To succeed on a § 1681i(a)(1)(A) claim, a plaintiff must show that the CRA's report contained factually inaccurate information, that the agency's investigation in response to the dispute was not reasonable, and that damages followed as a result. See Losch, 995 F.3d at 944 (citations omitted); McWhorter v. Trans Union LLC, No. 23-13427, 2024 WL 3385676, at *3 (11th Cir. July 12, 2024). The Parties here do not dispute that Plaintiff's credit report contained factually inaccurate information. Thus, the Court must first determine whether a genuine dispute of fact exists as to the reasonableness of Equifax's investigations concerning the accuracy of the disputed information.

"Whether a credit-reporting agency acted reasonably under the FCRA 'will be a jury question in the overwhelming majority of cases.'" Id. For example, in Losch, the Eleventh Circuit concluded it could not "say that [the CRA's] procedures were reasonable as a matter of law." Id. at 945. Losch, the consumer, reaffirmed his mortgage during his Chapter 7 bankruptcy. Id. at 940. Losch then filed a motion with the bankruptcy court to rescind his affirmation, which the bankruptcy court granted. Id. at 941. As a result, Losch no longer owed anything on the mortgage. Nonetheless, his Experian credit report still showed he owed a past-due balance on the mortgage. Id. He wrote a letter to Experian to dispute the debt, including the name of the creditor-mortgagee, the account number, and an explanation of the bankruptcy court's approval of his rescission of the mortgage reaffirmation. Id. In response to the dispute,

Experian sent an ACDV form to the mortgagee, and the mortgagee verified the debt. Id. Experian took no further steps to verify the debt and did not correct Losch's credit report until after he filed a lawsuit. Id. The Eleventh Circuit found that, "where Experian didn't even check the bankruptcy docket[,] a jury could find that it was negligent in discharging its obligations to conduct a reasonable investigation and reinvestigation into the disputed information." Id. at 946–47. The Circuit reasoned,

> Even when a consumer has informed the agency about inaccurate information, there may be circumstances—say, when the consumer supplies insufficient detail—in which there is no jury question about the reasonableness of the agency's investigation or reinvestigation. Or the facts may show that the agency took alternative steps to verify information, such as contacting the consumer.

Id. at 974. But where, as in Losch, the consumer provides a sufficiently detailed notice for the consumer reporting agency to investigate the alleged inaccuracy, and the agency does nothing other than forward the letter to the data furnisher, the agency's procedures are not reasonable as a matter of law. Id.

### i. The First Dispute.

As a matter of law, the Court finds Equifax's procedures for reinvestigation in response to Plaintiff's First Dispute were reasonable. See Bauer v. Target Corp., No. 12–cv–00978, 2013 WL 12155951, at *7 (M.D. Fla. June 19, 2013) (citing Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005)) (finding a data furnisher's reinvestigation reasonable where the consumer disputed a charge "on the basis that the account did not belong to him," and the furnisher merely verified the consumer's name, address, and date of birth, reasoning "a more thorough investigation might have been required in order to be considered reasonable if the furnisher had been given a

more detailed account of plaintiff's dispute, such as being notified that the dispute involved fraud"). Plaintiff's First Dispute contains no reference to identity theft or fraud. In the letter, Plaintiff merely states, "This is not my account." (Dkt. 58-2) Equifax characterizes assertions that an account does not belong to a consumer as ownership disputes. (Dkt. 67-3 at 19:19–20:2, 23:19-25) So, when Equifax forwarded Plaintiff's dispute to Capital One, Equifax merely asked Capital One to verify whether the Account existed in Plaintiff's name. Capital One responded that, indeed, the Account number appeared in Plaintiff's name. Based upon this information, Equifax verified the reporting of the Account to Plaintiff. The Court finds that Equifax's response to the First Dispute was reasonable as a matter of law.

### ii. The Second Dispute.

As for the Second Dispute, a genuine dispute of material fact exists as to whether Equifax's reinvestigation was reasonable. In Plaintiff's Second Dispute, he referenced the first 12 digits of the Account number and the amount of the Debt, $16,780. (Dkt. 58-5) Plaintiff stated, "This is not my account- please see the FTC Identity Theft Report attached." (Id.) In the attached FTC affidavit, Plaintiff identified the "account affected by the crime" as "Capital One," and the total fraudulent amount as "$16780." (Id.)

When Equifax received the Second Dispute, Equifax's policies and procedures required the dispute agent to find the FTC affidavit insufficient to block the Account from Plaintiff's file because the FTC affidavit did not contain the full or partial Account number. (Dkt. 67-3 at 37:25–38:8) Equifax's policies and procedures

19

apparently make no exception for a circumstance like this one, in which: the dispute letter contains the name of the disputed account, the partial account number, and the fraudulent amount; the FTC Identity Report contains the name of the disputed account and the fraudulent amount; and the consumer's credit file contains only one account by that name, and the balance and the amount past due for that account in the credit file is equal to the fraudulent amount stated in the identity theft report.

A reasonable jury could find that Equifax's policy was not reasonable because it required the dispute agent to conclude the FTC affidavit was invalid even though the required information that was purportedly missing from the FTC affidavit was contained elsewhere in the Second Dispute. A genuine issue of material fact exists as to whether Equifax's reinvestigation was reasonable given the dispute agent's apparent inability to assess the components of the dispute as a whole.

Additionally, the agent's apparent inability to communicate directly with a consumer whose dispute was only technically deficient creates a jury question as to the reasonableness of Equifax's investigation.[4] Equifax's only evidence that it contacted Plaintiff in response to his deficient FTC affidavit was a copy of a form letter Equifax sent to Plaintiff. The letter advised Plaintiff that before Equifax could block the Account, Equifax needed more information. (Dkt. 68-2 at ¶ 38; Dkt. 58-7 at 3) But Equifax's letter did not specify that Plaintiff's FTC Identity Theft Report was

---

[4] The Court notes, however, that the FCRA did not require Equifax to contact Plaintiff under these circumstances. King v. Asset Acceptance, LLC, 452 F. Supp. 2d 1272, 1279 (N.D. Ga. 2006) (citing Westra, 409 F.3d at 827).

considered incomplete because the Account number was missing from it. (Dkt. 68-2 at ¶ 39) Although the letter explained that Equifax would not block the inaccurate information without proof of Plaintiff's identity, (id.) see 15 U.S.C. § 1681c-2(a)(1), the letter did not provide any information about how to send his identification such that it would be received and associated with his dispute. As discussed *infra*, it appears unlikely Equifax would have been able to process new information sent by Plaintiff as supplemental to his Second Dispute.

A jury could conclude that Equifax's cursory efforts to gather the information needed to respond effectively to Plaintiff's dispute fell short. Moreover, Ms. Munson testified that she did not know whether the dispute agent who reviewed Plaintiff's Second Dispute had access to a phone or email.  (Id. at 50:5–51:24) A jury could conclude that Equifax's dispute agents are not generally equipped to contact consumers about disputes, even in cases where the dispute is only technically deficient. On this basis, a reasonable jury could find that Equifax's procedures for reinvestigations resulted in an unreasonable reinvestigation of Plaintiff's Second Dispute.

Equifax is not entitled to summary judgment on the element of Plaintiff's § 1681i(a)(1)(A) claim regarding the reasonableness of Equifax's reinvestigation as to the Second Dispute.

### iii.  The Third Dispute

A genuine dispute of material fact exists as to whether Equifax's reinvestigation concerning the Third Dispute was reasonable. See King v. Asset Acceptance, LLC,

452 F. Supp. 2d 1272, 1279 (N.D. Ga. 2006) (denying summary judgment to the furnisher where the consumer's dispute and the ACDV notified the furnisher of potential fraud, and the furnisher merely verified the identification of the consumer as the accountholder). Although the Third Dispute referenced Plaintiff's Second Dispute and repeated his allegation that the Account was the result of identity theft, Equifax's dispute agent inaccurately characterized the Third Dispute as an ownership dispute. Plaintiff's Third Dispute stated that the Account had inaccurately been verified despite the FTC Identity Theft Affidavit attached to the Second Dispute. (Id. at ¶ 47) Plaintiff also attached the credit card statements from Capital One and USAA as purported proof that he did not authorize the Account. Nonetheless, Equifax's dispute agent apparently did not understand that the Third Dispute was a follow-up on the outcome of Plaintiff's Second Dispute. Because the agent failed to accurately characterize the Third Dispute as one related to identity theft or fraud, Equifax's ACDV asked Capital One to merely verify whether the Account belonged to Plaintiff.

The Court cannot find that Equifax conducted a reasonable reinvestigation as a matter of law. First, the dispute agent was apparently unable to discern that this dispute was a continuation of prior disputes by Plaintiff of the same inaccurate information. Second, even though the contents of the Third Dispute make clear the dispute is based on an allegation of identity theft, Equifax's reinvestigation did not to characterize it as such. A reasonable jury could find that Equifax failed to conduct a reasonable reinvestigation because Equifax did not treat the Third Dispute as continuing communication related to Plaintiff's claim that the Account was the result of fraud.

### iv. Plaintiff's Fourth Dispute.

As for the Fourth Dispute, the Court cannot conclude that Equifax's reinvestigation was reasonable as a matter of law. When Equifax received the Fourth Dispute, Plaintiff had disputed the same information in his credit file four times. Nonetheless, in response, Equifax merely sent another ACDV to Capital One. (Dkt. 58-12) The ACDV acknowledged Plaintiff had sent Equifax an FTC Identity Theft Report four months prior. (Dkt. 58-12) But Equifax did nothing to investigate Plaintiff's allegations of identity fraud other than send an ACDV to Capital One. A reasonable jury could find that Equifax's reinvestigation of the Fourth Dispute—the culmination of Plaintiff's attempts to correct the inaccuracy in his credit file and on his credit reports—was unreasonable.

### c. Equifax is not entitled to summary judgment on Plaintiff's allegation that the alleged FCRA violations were willful.

Equifax is not entitled to summary judgment on Plaintiff's claim that it willfully violated the FCRA. "Under 15 U.S.C. § 1681n(a), '[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer' for actual, statutory, or punitive damages." Collins, 775 F.3d at 1336 (quoting 15 U.S.C. § 1681n(a)) (citations omitted). A knowing violation of the FCRA is a willful violation. Harris v. Mex. Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir. 2009). A violation is also willful if made with "reckless disregard for the law." Id. A company does not act in reckless disregard of the FCRA "unless the action is not only a violation under a reasonable reading of the

statute's terms[] but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." <u>Safeco</u>, 551 U.S. at 69; <u>Collins</u>, 775 F.3d at 1336 ("Taking no steps other than contacting only [the data furnisher] with an ACDV form regarding the disputed entry might have been negligent, but willfulness or recklessness is a higher standard that has not been met in this case."). Examples of willful violations include "committing an FCRA violation that amounts to more than an isolated instance of human error which was promptly cured; engaging in misrepresentation or concealment; or failing to follow its own FCRA reinvestigation procedures." <u>Rambarran v. Bank of Am., N.A.</u>, 609 F. Supp. 2d 1253, 1272 (S.D. Fla. 2009) (citations and internal quotations omitted) (cleaned up).

The Court finds the question of whether Equifax willfully violated the FCRA must be decided by a jury. First, a jury could find that Equifax's policy that requires a dispute agent to conclude than an FTC Identity Theft Report is invalid even if the relevant information missing from the report is contained elsewhere in the consumer's documents creates a substantial risk that Equifax will violate its duty to "review and consider all relevant information submitted by the consumer" concerning dispute information. 15 U.S.C. § 1681i(a)(4). Additionally, a reasonable jury could find that Equifax's repeated failure to acknowledge Plaintiff's persistent efforts to correct an inaccuracy in his credit file exhibited a reckless disregard for its duty to conduct a reasonable investigation of reported inaccuracies. For example, Equifax's procedure for processing disputes allowed the dispute agent who reviewed Plaintiff's Third

Dispute to overlook the fact that the Third Dispute concerned the Second Dispute, which contained the FTC affidavit. A reasonable jury could find that Equifax's procedures exhibit a reckless disregard for the risk that legitimate disputes may not be effectively reviewed, even when a consumer disputes the same information several times.

Based on the foregoing, the Court finds summary judgment is not appropriate as for Plaintiff's claims of willful violations of the FCRA.

### d.  Plaintiff's damages claims must be put to a jury.

To recover on claims of negligent noncompliance with the FCRA, a plaintiff must show the consumer reporting agency's violation caused the consumer to suffer actual damages. See 15 U.S.C. §§ 1681n(a)(1)(A) and 1681o(a)(1); Santos v. Healthcare Revenue Recovery Grp., LLC, 90 F.4th 1144, 1152–53 (11th Cir. 2024). "Actual damages may include mental distress, even in the absence of out-of-pocket expenses or physical injury." Younger v. Experian Info. Sols., Inc., 817 F. App'x 862, 869, 871–72 (11th Cir. 2020) (citing Levine v. World Fin. Network Nat'l Bank, 437 F.3d 1124–25 (11th Cir. 2006)) (finding the plaintiff's testimony concerning "definite, albeit impalpable, injuries" caused by the CRA's violation sufficient to support the jury's award of damages for the plaintiff's physical pain and mental distress);[5] Marchisio v. Carrington Mort. Servs., LLC, 919 F.3d 1288, 1304–05 (11th Cir. 2019);

---

[5] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it may be considered as persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000). Where cited herein, any unreported decision of a panel of the Circuit is considered well-reasoned and is offered as persuasive, not binding.

Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 513 (5th Cir. 1982). Additionally, "out of pocket expenses, including postage, travel, and uncompensated time spent away from work, in challenging" inaccurate information in a credit file are "accepted categories of damages under the FCRA . . . ." Roberts v. Equifax Info. Servs., LLC, No. 19-CV-1365, 2019 WL 11497082, at *11 (N.D Ga. Nov. 2, 2019) (internal quotations omitted).

Here, Plaintiff presents evidence in the form of his deposition testimony that Plaintiff suffered emotional distress as result of Equifax's alleged failure to reasonably reinvestigate Plaintiff's Second, Third, and Fourth Disputes. (Dkt. 67-2 at 56:7-18) Plaintiff further claims damages based upon the hours of time he spent trying to correct the error in his credit file. Although Plaintiff testified he could not single out Equifax— vis-à-vis the other Defendants in this case—as having caused his damages, (Id. at 53:4-10), a jury should determine whether to credit Plaintiff's testimony about his claimed damages and how to apportion Equifax's share of liability for any damages he testifies he suffered, including emotional distress and time spent seeking to have the error corrected.

Because Plaintiff presents evidence that he suffered actual damages as a result of Equifax's alleged FCRA violations, Equifax's Motion as to damages is **DENIED**.

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED**:

1.  Equifax's Motion for Summary Judgment, (Dkt. 58), is **GRANTED IN PART and DENIED IN PART.**

2.  Equifax is entitled to summary judgment on Plaintiff's claim under 15 U.S.C. § 1681e(b). The Motion is **GRANTED** as to Count II of the Complaint. As to Count III, the Motion is **DENIED**.

3.  The Court will enter an amended case management and scheduling order by separate notice.

**DONE** and **ORDERED** in Tampa, Florida, this 5th day of February 2025.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person